UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**DAEYON ROSS,**<br><br>**Defendant.** | Case No. 23-CR-233(CJN) |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. Defendant Daeyon ROSS ("ROSS") faces an advisory Guidelines range of 228 months to 255 months of imprisonment with a mandatory minimum sentence of 120 months, related to a crime spree that included one murder, two attempted murders of police officers, two murdered pet dogs, three armed carjackings, and four motor vehicle accidents. For the reasons articulated below, the United States respectfully submits that that ROSS should be sentenced to a term of **240** months' imprisonment.

### PROCEDURAL HISTORY AND RELEVANT FACTS

At approximately 12:00pm on July 2, 2023, Metropolitan Police Department ("MPD") Sergeant Thau, who was utilizing the Falcon Helicopter, responded to an unrelated incident. During his attempted surveillance of that incident, he spotted a black BMW vehicle, driven by ROSS, failing to stop at stop signs and crosswalks, going around cars, and travelling at a high rate of speed down Sheriff Road, Northeast. Sergeant Thau saw that ROSS' driving became even more erratic, crossing the double yellows, going against traffic and scarcely applying the brake, all within a populated area. Sergeant. Thau then began following the black BMW as it crossed into

Maryland. At the same time, MPD units on the ground attempted to pursue but were unsuccessful due to his high rate of speed. Sergeant Thau continued following the black BMW and watched as that vehicle, while driving in the wrong lane against traffic, crashed head-on with a Chrysler on Addison Road in Maryland. As seen below, this first crash occurred approximately 5 miles into the chase.



After the collision, ROSS exited the BMW with a gun in his hand and approached a Honda CRV that had stopped near the accident. ROSS forced the driver out of the CRV at gunpoint, entered the vehicle, and began driving before the CRV's passenger had time to exit the vehicle; leaving the passenger to fall from the vehicle onto the road, causing injuries requiring hospitalization. ROSS drove for approximately two miles on Central Avenue until he crashed into the center median, as shown below.



After the crash, ROSS again exited his vehicle with a gun and walked to the nearby McDonalds parking lot where he approached two vehicles in the drive-thru line, but both vehicles fled before ROSS could carjack them. Next, ROSS approached an Acura ILX vehicle at McDonalds and had an altercation during which ROSS discharged his handgun through the open driver door of the vehicle. The driver subsequently succumbed to his injuries and died.

ROSS then approached and carjacked a Scion vehicle, forcing two civilians out of the vehicle at gunpoint. ROSS placed the car in reverse with the car doors open, nearly striking the passengers as they fled. Three dogs were in the Scion, but two were found to have been shot and killed when the vehicle was recovered. Exiting McDonalds, ROSS drove the Scion toward the law enforcement vehicles that had been dispatched, almost causing a collision and endangering law enforcement officer lives before driving back into the District of Columbia. ROSS' high-speed flight from law enforcement for 2.8-mile travels from McDonalds to the DC-Maryland border is seen below.



Around that time, a 911 call was made by Witness-1, who stated:

> I'm at a Shell gas station, and this car just like crashed into one of the things in the middle of the road and he got out, had a gun, and started shooting at someone in a car in the McDonald's drive thru. He didn't let the car go, and … I don't know if this person is okay . . . a police officer just got here but I think I need an ambulance too I don't know if the person is okay … they were trying to carjack them . . . they started running down the street and I think they were able to successfully carjack someone else.

Witness-1 further described seeing the suspect fire two shots into the car during his attempt to carjack the vehicle. Witness-1 described the suspect as "black, looked like a young man, slim, he was wearing a ski mask and a white tank top" and that he was holding a black handgun. A second 911 call came in shortly thereafter, where Witness-2 called asking for help for a man dying in a white Acura by Ritchie Road. Witness-2 was deeply upset about what he was witnessing but managed to describe the Decedent as suffering from gunshot wounds and "bleeding out of his face and everything."

ROSS drove the carjacked Scion from Maryland back into the District of Columbia at a speed greater than 90 miles per hour with no regard for traffic signs or traffic laws. Sergeant Thau observed this and, to combat ROSS' life-threatening behavior, Sergeant Thau coordinated with law enforcement on the ground to try to create traffic closures to prevent such an accident from taking place. Sergeant Thau also noted that ROSS' driving and behavior was "so reckless" that it was safer to maintain one channel with Maryland law enforcement rather than attempting to include District of Columbia law enforcement in the ongoing high-speed chase. Law enforcement created road closures and followed ROSS for 1.3 miles in the District of Columbia where, around the intersection of Sheriff Road, and 52nd Street, Northeast in the District of Columbia, ROSS' reckless driving caused a collision with two civilian vehicles.



ROSS exited the stolen Scion with a gun and approached one of the vehicles involved in the crash but was unable to open the door. ROSS then approached the other vehicle involved in the three-car crash, a GMC Terrain, where he opened the passenger door, brandished his firearm,

and said "bitch get the fuck out of the car." The driver and backseat passenger (a 14-year-old girl) exited quickly while the passenger (a 67-year-old woman) attempted to do so. ROSS then jumped into the passenger seat of the GMC and straddled the 67-year-old face-to-face holding the firearm to her chest. ROSS then pushed the elderly woman out of the vehicle, and she fell to the ground. ROSS then moved to the driver's seat as the victims fled. ROSS attempted to flee the scene in the GMC but collided with a police cruiser on the same block. ROSS fired at least two shots at the MPD Officer operating that cruiser through the GMC passenger window. Screenshots from the Officer's BWC show the plume of smoke from ROSS' shooting towards him and the subsequent broken passenger window of the GMC Terrain vehicle.





ROSS then opened the GMC's driver side door and fired at least two additional shots at a second MPD Officer that was responding to the scene. In addition to the grave risk ROSS posed to the law enforcement officers he fired at, he also endangered multiple civilians who were in the residential area as seen in the images below.







On the phone with his mother during the high-speed chase, ROSS apologized and told her he would not be coming home. This is consistent with other statements he made regarding suicide by cop. ROSS stated that he was mad the police did not kill him, and that he "should have done it himself." To law enforcement, ROSS stated, "I ain't coming home I knew that y'all missed them shots. Ya'll missed them shots, go back to target practice, I'm a gangster, 22, you know that… I'm a gangster. A-ha! I went crazy today officer, on a Sunday, today is god's day, why the fuck y'all messing with me officer."

On July 18, 2023, a federal grand jury sitting in the District of Columbia returned a six-count Indictment charging ROSS with numerous offenses related to his crime spree on July 2, 2023. ROSS pled guilty to Counts Two and Three of the Indictment on August 30, 2023, pursuant to a written plea agreement. Those offenses charged ROSS with Carjacking, in violation of 18 U.S.C. § 2119(1), and Discharging a Firearm During and in Relation to a Crime of Violence, in

violation of 18 U.S.C. § 924(c)(1)(A)(iii). ROSS' sentencing is scheduled for October 24, 2025. Minute Order, 8/18/25.

I.  **UNITED STATES' ANALYSIS OF THE SENTENCING GUIDELINES**

Even though the Sentencing Guidelines are advisory, United States v. Booker provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005) (cited in United States v. Brown, 892 F.3d 385, 399 (D.C. Cir. 2018)). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. Gall v. United States, 590 U.S. 38, 49 (2007); see also United States v. Dorcely, 454 F.3d 366, 375 (D.C. Cir. 2006) ("Booker has not changed how the Guidelines range is to be calculated."). Moreover, the Guidelines' recommended sentencing range will ordinarily "'reflect a rough approximation of sentences that might achieve [18 U.S.C.] § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 108-09 (2007) (quoting Rita v. United States, 551 U.S. 338, 347-50 (2007)); see also Dorcely, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. United States v. Flores, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry must include an evaluation of all relevant conduct that could affect the Guidelines calculation.

> In the post-Booker world, the court must calculate and consider the applicable Guidelines range but is not bound by it. Under the Guidelines, "the sentencing range for a particular offense is determined on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction." Witte v. United States, 515 U.S. 389, 393 (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the sentencing court may consider in determining the applicable Guidelines range and the commentary to that section states, "Conduct that is not formally charged

or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, comment., backg'd.

Dorcely, 454 F.3d at 375. Moreover, Defendant is liable both for his own actions, as well as any actions of his co-conspirators which were: within the scope of the conspiracy, undertaken in furtherance of the conspiracy, and reasonably foreseeable to Defendant in connection with the conspiracy. U.S.S.G. § 1B1.3(a)(1)(B); United States v. Childress, 58 F.3d 693, 724-25 (D.C. Cir. 1995).

### A.  Calculation of ROSS's Criminal History Category

ROSS was convicted of Robbery While Armed in D.C. Superior Court Case Number 2017 CF3 11265. On January 25, 2018, he was sentenced to 72 months' incarceration, with 12 months suspended, to be followed by 5 years' supervised release. This conviction warrants 3 criminal history points pursuant to U.S.S.G. § 4A1.1(a).

ROSS was convicted of Robbery in D.C. Superior Court Case Number 2017 CF3 19988. On October 17, 2018, he was sentenced to 24 months' incarceration. This conviction warrants 3 criminal history points pursuant to U.S.S.G. § 4A1.1(a).

Thus, ROSS has a total of 6 criminal history points, placing him in Criminal History Category ("CHC") III.

### B.  Calculation of ROSS' Advisory Guidelines Range

The parties agreed to the following calculation of the Sentencing Guidelines:

Count Two:
| | | |
|---|---|---|
| U.S.S.G. § 2B3.1(a) | Base Offense | 20 |
| U.S.S.G. § 2B3.1(b)(5) | Carjacking | +2 |
| U.S.S.G. § 3A1.1(b) | Vulnerable Victim | +2 |
| U.S.S.G. § 3A1.2(c)(1) | Official Victim | +6 |
| U.S.S.G. § 3C1.2 | Reckless Endangerment During Flight | +2 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | - 3 |
| | Total | **29** |

Count Three:

The Guideline sentence is 120 months, which is also the mandatory-minimum sentence. By statute, any sentence imposed for Count Three must be served consecutively to sentence imposed for Count Two.

Offense Level 29 in Criminal History Category III calls for an advisory Guidelines range of 108 months to 135 months for Count Two, followed by a consecutive term of 120 months for Count Three, for a total of 228 to 255 months, with a mandatory-minimum sentence of 120 months.

## II.   UNITED STATES' ANALYSIS OF THE STATUTORY SENTENCING FACTORS

When determining the appropriate sentence, the district court should consider all the applicable factors set forth in 18 U.S.C. § 3553(a). See United States v. Gall, 552 U.S. 38, 49-50 (2007). That Section provides that the Court consider the following: (A) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (B) "the history and characteristics of the defendant," *id*.; (C) general and specific "deterrence," 18 U.S.C. § 3553(a)(2)(B); (D) the need "to protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C); (E) the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D); and (F) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

### A. The History and Characteristics of the Defendant

The Court's analysis of the appropriate sentence should begin at ROSS' persistent criminal history, which began when he was still a teenager. The counts of conviction in this case constitute ROSS' seventh arrest related to robbery and ninth arrest related to the use of a weapon. This, even

though – as self-reported to the PSR writer – ROSS had a close relationship with his family with no abuse or neglect growing up.

### B. Nature and Circumstances of the Offense

The severity of ROSS' criminal conduct on July 2, 2023, cannot be overstated. When law enforcement responded to his overtly reckless driving, ROSS began a crime spree that resulted in one murder, three armed carjackings, four motor vehicle accidents, two dead dogs, and the attempted murder of two uniformed police officers. At no point did ROSS demonstrate care for civilian life or his own life, stating that he wished the law enforcement officers had killed him. The extreme risk that ROSS created on July 2, 2023, strongly supports a lengthy period of incarceration and supervised release.

### C. General and Specific Deterrence

Imposition of a significant sentence is necessary to provide for both general and specific deterrence. "Under the theory of general deterrence, the government essentially seeks to make an example of an offender through punishing him so that other potential offenders are intimidated into refraining from committing the contemplated crime." United States v. Slatten, 865 F.3d 767, 819 (D.C. Cir. 2017) (noting that "harsh sentences" "generally operate as strong deterrents"); United States v. Diaz-Navarro, 567 F. App'x 256, 257 (5th Cir. 2014) (since the defendant had committed offense before and received a light sentence a ""long incarceration period"" was necessary for deterrence); United States v. Rivera, 488 F. App'x 225, 227 (9th Cir. 2012) (harsh sentence necessary for deterrence in light of defendant's recidivism).

ROSS' shootings and armed carjackings occurred in the middle of the deadliest year in the District of Columbia since 1997, giving our jurisdiction the fifth-highest murder rate amongst the nation's biggest cities. Of the 274 murders that occurred in 2023, ninety percent of those were

committed with guns. See Emily Davis *et. al.*, <u>2023 was District's Deadliest Year in More than Two Decades</u>, WASH. POST (Jan. 1, 2024), *available at https://www.washingtonpost.com/dc-md-va/interactive/2024/dc-crime-homicide-victims-shooting-violence* (last visited May 15, 2024). The gun violence epidemic this jurisdiction faces is caused by individuals like ROSS who carry no regard for laws that prevent him from possessing and using firearms. See <u>Gall</u>, 552 U.S. at 54 (recognizing that "a lenient sentence for a serious offense threatens to promote disrespect for the law"). A significant period of incarceration is necessary to demonstrate to the public that such brazen and dangerous behavior – reckless driving, carjackings, and shooting – cannot be tolerated and will be met with swift and serious punishment.

A significant period of incarceration is also necessary for specific deterrence. ROSS has demonstrated an affinity for crime, especially when it comes to possessing a weapon and committing robberies. ROSS pled guilty to two of the three robberies with a weapon that he was charged for in 2017, and the third was dismissed as part of a plea agreement. After a subsequent five-year period of incarceration, ROSS was released on January 28, 2022. Less than 18 months later, ROSS committed the offenses in this case. Clearly, ROSS' prior terms of incarceration have not encouraged him to rehabilitate and have not deterred his criminal conduct. Accordingly, a significant period of incarceration and supervised release is necessary here to deter ROSS from gaining of control of another firearm, committing robberies, and endangering lives upon his release.

### D. The Need to Protect the Public from Further Crimes of the Defendant

The need for a lengthy period of incarceration is a matter of public safety. ROSS has repeatedly demonstrated his willingness to use firearms in ways that present grave risks to both

bystanders and law enforcement. ROSS' persistent refusal to obey the law creates an untenable situation where law enforcement is simply waiting to hear of ROSS' next crime.

### III. UNITED STATES' SENTENCING RECOMMENDATION

For the reasons stated, the United States requests this Court sentence ROSS to consecutive terms of 120 months' imprisonment for Count Two and Count Three, for a total sentence of **240** months, followed by 60 months of supervised release.

        Respectfully submitted,

        JEANINE FERRIS PIRRO
        United States Attorney

By:    */s/ James B. Nelson*
       JAMES B. NELSON
       D.C. Bar No. 1613700
       Assistant United States Attorney
       Violent Crime and Narcotics Trafficking Section
       601 D. Street, N.W.
       Washington, D.C. 20530
       (202) 252-6986
       james.nelson@usdoj.gov